# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:16-cv-00872-FDW
# (3:12-cr-00146-FDW-3)

| | |
|---|---|
| **SYLVESTER CRUSE, JR.,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Respondent. ) | |
| ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [CV Doc. 1][1] and on Petitioner's motion for an enlargement of time to reply to the Government's response [CV Doc. 13].

**I.    BACKGROUND**

    **A.    Petitioner's Underlying Criminal Conduct.**

In the spring of 2012, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") conducted an undercover reverse sting operation, or home invasion investigation, which were being used by ATF throughout the United States. [CR Doc. 152 at 34-37].[2] In a reverse sting operation, law enforcement officials work undercover to offer individuals who are predisposed to committing certain crimes the opportunity to commit such crimes. [Id.]. These operations are a

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 3:16-cv-872-FDW, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 3:12-cr-146-FDW-3.

[2] The transcript from the trial in this matter can be found at Docket Numbers 152 through 156 and is cited herein accordingly.

proactive means to investigate individuals who are committing armed robberies in the community. [Id. at 36].

The operation initially focused on Williams Suttles-Barden, one of Petitioner Sylvester Cruse, Jr.'s ("Petitioner") co-defendants in the underlying criminal proceedings. [Id. at 43-44]. Suttles-Barden had committed numerous armed robberies with others. [CR Doc. 153 at 258-59]. Suttles-Barden and his cohorts targeted drug dealers and people Suttles-Barden knew were receiving money. [Id.]. They committed home invasions and routinely used violence or firearms. [Id. at 259]. In March 2012, a confidential informant ("CI") known as T.J., paid by law enforcement, informed Suttles-Barden of a potential opportunity to commit a home invasion and steal ten kilograms of cocaine. [CR Doc. 152 at 44-45, 56; CR Doc. 153 at 278-79]. Suttles-Barden called Petitioner the day after he learned of the home invasion opportunity to ask for help. [CR Doc. 153 at 280-81]. Suttles-Barden trusted Petitioner and knew that Petitioner had experience with firearms and robberies. [Id. at 275, 277, 282-84]. Petitioner agreed to participate in the home invasion with Suttles-Barden, stating "he was down with it." [Id. 153 at 282]. Petitioner told Suttles-Barden that he had previously participated in robberies and that Petitioner could obtain guns for the robbery, so Suttles-Barden would not need to. [Id. at 275, 277, 282-84]. Petitioner told Suttles-Barden that he planned to divide his share of the cocaine into quarter-ounce quantities to sell in the neighborhood. [Id. at 282]. Suttles-Barden also recruited another individual, Antron Miller, who is another co-defendant, to participate in the robbery. [Id. at 281, 303]. Suttles-Barden and Miller had committed robberies together in the past. [Id. at 258-59].

On March 27, 2012, T.J. introduced Suttles-Barden to ATF Agent Shawn Stallo, who was undercover. They discussed the plan for the robbery. [CR Doc. 152 at 31, 33, 53-54; CR Doc. 153 at 284-85, 289]. Stallo told Suttles-Barden that he and his partner were couriers for drug

traffickers and that he wanted someone to rob those traffickers. [Id. at 54-55; CR Doc. 153 at 285]. Stallo described a plan to use guns to rob the traffickers' stash house, a single-family home in a residential neighborhood where the traffickers kept large quantities of cocaine until it could be distributed within the community. [Id. at 38-39, 59-60; CR Doc. 153 at 220]. Suttles-Barden told Stallo that he had a "crew" who could pull off the robbery, referring to Miller and Petitioner. [CR Doc. 153 at 285]. Suttles-Barden also told Stallo that he "had everything that he needed, the guns and masks and ropes and drawstrings, and stuff like that." [Id. at 286]. Suttles-Barden told Stallo when they did the robbery he would "shoot the first person that was in the house" to give Suttles-Barden "control over the situation," something he had done in previous robberies. [Id. at 301-02].

Stallo told Suttles-Barden that the stash house would likely contain eight to twelve kilograms of cocaine. [CR Doc. 152 at 61-62]. Under the agreement, Stallo was to receive two to three kilograms of the stolen cocaine and Suttles-Barden and any associates of his would receive the rest. [Id. at 68]. Stallo explained that he sought to recruit only someone who was interested in obtaining cocaine and had the ability to distribute it. [Id. at 61-62]. Stallo made clear to Suttles-Barden that if he did not like the plan, he could simply forget what Stallo looked like and move on, with no hard feelings. [Id. at 56]. After meeting with Stallo, Suttles-Barden described the entire plan to Petitioner. [CR Doc. 153 at 305-06]. Suttles-Barden, however, told Petitioner that the house would only contain six kilograms of cocaine, not eight to twelve, as Suttles-Barden had been told. [Id. at 290; CR Doc. 154 at 406-07]. Suttles-Barden planned to give Petitioner and Miller each one kilogram of cocaine. Further, he planned to rob Stallo and take his cocaine. [Id. at 291].

3

Suttles-Barden met with Stallo on two other occasions. [CR Doc. 153 at 77-78, 306]. On both occasions Stallo was accompanied by Sergeant Jesus Rendon of the Charlotte-Mecklenburg Police Department. Rendon was also undercover, posing as someone working directly for a Mexican drug cartel. [Id. at 78-79, 86, 208, 210, 213-14]. During these meetings, Suttles-Barden remained committed, despite being told repeatedly by Stallo that he did not have to commit the robbery if he was uncomfortable with anything. [Id. at 78-79, 111-12, 198]. Suttles-Barden also spoke with Petitioner about the robbery on numerous occasions. Petitioner never expressed concerns or indicated he did not want to participate. [Id. at 329]. On April 10, 2012, T.J. picked up Suttles-Barden in a minivan and took him to Petitioner's house. [Id. at 115-17, 333-34, 337-38, 340-41]. Suttles-Barden said to Petitioner, "it's time to do the lick," which is a slang term for robbery. [Id. at 170, 323, 337]. Petitioner responded, "all right." [Id. at 337]. Petitioner then obtained a shotgun and several shotgun shells from his son, which he placed in the minivan. [Id. at 338-41]. The three men then drove to pick up Miller. [Id. at 345].

T.J. drove the Suttles-Barden, Petitioner, and Miller to a gas station where the undercover officers, Stallo and Rendon, had arranged to meet Suttles-Barden and his crew in advance of the robbery. [Id. at 115-17, 222, 333-34]. When they arrived at the gas station, Petitioner had a shotgun in his lap and was holding shotgun shells. [Id. at 131, 226-27]. Petitioner raised his shotgun and said, "I'm ready." [Id. at 226]. The officers discussed the plan for the robbery with the three men, making sure they understood they were about to commit an armed robbery for cocaine and that everyone remained a willing participant. [Id. at 122-24]. Petitioner asked about the amount of cocaine that would be in the stash house and the officers told him eight to twelve kilograms. [Id. at 125]. Petitioner, Suttles-Barden, and Miller said they were ready. [Id. at 229]. The officers asked Petitioner and the others to follow them to a storage facility where they would

4

wait for a call from the drug-trafficking organization informing them where the stash house was located. [Id. at 131, 232]. After everyone arrived at the storage facility, an arrest team moved in and arrested Petitioner and the others. [Id. at 233].

Petitioner was advised of his rights and agreed to speak with law enforcement officers. He admitted his involvement in the robbery plan. [CR Doc. 154 at 555-63; Doc. 155 at 578]. Specifically, Petitioner admitted that he agreed to participate in the robbery, that he was informed that eight to ten kilograms of cocaine were supposed to be in the stash house, that he and his cohorts planned to rob the stash house and split the cocaine they recovered, and that Petitioner intended to sell his share on the streets. [CR Doc. 138 at ¶ 13: Presentence Investigation Report (PSR)]. Petitioner also admitted bringing the shotgun and shotgun shells with him and that the plan involved Suttles-Barden and Miller going into the stash house shooting. [Id.].

### B. Petitioner's Indictment, Trial, and Sentencing

Petitioner was charged in a Bill of Indictment with one count of Hobbs Act conspiracy in violation of 18 U.S.C. § 1951(a) (Count One); one count of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 (Count Two); one count of possession of a firearm in furtherance of a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three); one count of conspiracy to possess a firearm in furtherance of a crime of violence and drug trafficking crime in violation of 21 U.S.C. § 846 (Count Four); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Five). [CR Doc. 17: Bill of Indictment]. Count Three, which is at issue in these proceedings, reads:

> On or about April 10, 2012, in Mecklenburg County, in the Western District of North Carolina, the defendants, [Williams Suttles-Barden, Antron Kodale Miller and Petitioner] <u>during and in relation to a crime of violence, that is, Conspiracy to Obstruct, Delay</u>

5

> and Affect Commerce and the Movement of Articles and Commodities in Commerce, by Robbery, a violation of Title 18, United States Code, Section 1951(a), as charged in Count One of this Indictment, **and** during and in relation to a drug trafficking crime, that is, Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance, a violation of Title 21 United States Code, Section 846, as charged in Count Two of this Indictment, for which they each may be prosecuted in a court of the United States, did knowingly and unlawfully possess and carry a firearm in furtherance of such crime of violence and drug trafficking crime, to wit, an HS Products model XD9 9 mm pistol with ammunition and a Mossberg 12 gauge shotgun model 500A with ammunition.
>
> In violation of Title 18, United States Code, Section 924(c).

Petitioner pleaded not guilty to these charges [CR Doc. 18] and proceeded to trial.

During a five-day trial, the jury heard testimony as provided above in the recitation of underlying criminal conduct. After the Government's presentation of evidence, Petitioner's attorney moved to dismiss the charges, arguing that the Government's conduct was "outrageous." [CR Doc. 155 at 632-34]. He argued that the government participated substantially in the offense, creating it out of whole cloth with the help of a paid confidential informant. [Id. at 632]. He maintained that the ATF had no reason to suspect wrongdoing on the part of Petitioner before Petitioner became involved in the sting operation. [Id.]. The Court denied the motion to dismiss. [Id. at 635-36].

The jury found Petitioner guilty on all five counts of the Indictment. [CR Doc. 125: Verdict Form]. The Court sentenced Petitioner to a total term of imprisonment of 300 months, the mandatory-minimum sentence called for by the applicable statutes, including a mandatory consecutive sentence of 60 months on the § 924(c) charge in Count Three. [CR Doc. 157 at 22-23: Sentencing Tr.; CR Doc. 143: Judgment]. The sentence represented a downward variance from the advisory guidelines range of 420 months to life. [CR Doc. 144: Statement of Reasons].

### C. Petitioner's Appeal and Motion to Vacate.

Petitioner appealed, contending that his attorney provided ineffective assistance by not arguing outrageous government conduct or asserting an entrapment defense. See United States v. Cruse, 642 F. App'x 276 (4th Cir. Mar. 31, 2016). The Fourth Circuit affirmed, finding that the record did not conclusively establish ineffective assistance. Id. Petitioner filed the pending Section 2255 motion to vacate on December 28, 2016. [CV Doc. 1]. Petitioner asserts the following grounds for relief: (1) the "[i]ndictment should be dismissed due to outrageous government conduct in creating a crime from beginning to end only for the purpose of prosecuting it;" (2) ineffective assistance of trial counsel for "failing to move for Dismissal of the Indictment for outrageous government conduct or entrapment;" and (3) "Petitioner's conviction under 18 USC § 924(c) must be vacated in light of Johnson v. U.S., 135 S. Ct. 2551, because Hobbs Act Robbery is not a "Crime of violence" as contemplated by § 924(c)." [CV Doc. 1 at 4-7].

On the Government's request, the matter was stayed pending the Fourth Circuit's decision in United States v. Ali, No. 15-4433. [CV Doc. 3]. The Fourth Circuit then ordered that Ali would be held in abeyance pending the Supreme Court's decision in United States v. Davis, No. 18-431. The Supreme Court decided Davis on June 24, 2019. Subsequently, the Court allowed Petitioner to supplement his motion with additional argument in light of Davis. [CV Docs. 4, 6]. Then, the Court ordered the parties to show cause why the stay should not be lifted. [CV Doc. 7]. The Government agreed that the stay should be lifted and timely filed its response to Petitioner's motion to vacate. [CV Doc. 12].

The matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings …" in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. As discussed above, after examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines, 423 F.2d at 529.

## III. DISCUSSION

### A. Petitioner's Challenge of the Indictment

Petitioner claims, on collateral review, that the Indictment should be dismissed because the Government's conduct in "creat[ing] the crime from beginning to end only for the purpose of prosecuting it," was outrageous and violative of Petitioner's rights under the Fifth Amendment. In addition to being procedurally barred from the outset, see United States v. Bowman, 267 Fed. App'x 296, 299 (4th Cir. 2008), Petitioner's claim is wholly without merit.

In United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637 (1973), the Supreme Court noted that there may be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Id. at 431-32. The "outrageous conduct" doctrine exists in theory but is "highly circumscribed." United States v. Hasan, 718 F.3d 338, 343 (4th Cir. 2013). A defense based on outrageous government conduct requires conduct "so outrageous as to shock the conscience of the court." United States v. Osborne, 935 F.2d 32, 36 (4th Cir. 1991). The Fourth Circuit has "emphasized that these claims will be recognized only in 'rare cases.'" United States v. Dyess, 478 F.3d 224, 234 (4th Cir. 2007). And, in fact, the Fourth Circuit "has never held in a

specific case that the government has violated the defendant's due process rights through outrageous conduct." Hasan, 718 F.3d at 343. Further, the Fourth Circuit has held that the government does not have to "demonstrate that it had a reasonable suspicion of wrongdoing on [the defendant's] part before it began the undercover operation." Osborne, 935 F.2d at 35.

Convictions in reverse sting operations have been upheld even where agents continued to pursue targets who expressed hesitation and leaned on intermediaries to convince targets to participate in illegal conduct. See United States v. Jones, 976 F.2d 176, 181-82 (4th Cir. 1992). Ultimately, "[t]he issue is not whether the government created an enticing scenario, but whether defendant willfully decided to participate in that scenario. Patterson v. United States, No. 3:14-cv-342-MOC, 2014 WL 6390994, at *3 (W.D.N.C. Nov. 17, 2014). Here, Petitioner was a ready and willing participant from the moment the idea was presented to him by Suttles-Barden. The first time Petitioner met agents involved in the operation he arrived with a shotgun in hand and said, "I'm ready." [CR Doc. 153 at 226]. Petitioner's challenge of the Indictment because of the Government's purportedly outrageous conduct is unsupported in law and fact.

Because Petitioner's claim on this issue had been procedurally defaulted and fails on the merits, in any event, the Court will deny Petitioner's motion based on this argument.

### B. Petitioner's Claims of Ineffective Assistance of Counsel

Petitioner also contends that his attorney was ineffective for failing to move for dismissal of the Indictment on the basis of outrageous government conduct and/or entrapment.[3] The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show

---

[3] Although Petitioner frames his argument in this regard, it is most appropriately considered as an argument that his attorney should have raised these issues as affirmative defenses at trial at the Court will consider the argument accordingly.

ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

Petitioner argues that his attorney affirmatively opted not to present an entrapment defense and that, if his attorney had presented the affirmative defense of entrapment or outrageous government conduct, there is a reasonable probability that the outcome would have been different. [CV Doc. 1 at 29]. As to a defense of outrageous government conduct, Petitioner has not shown deficient performance or prejudice. As discussed above, a claim of outrageous government conduct poses an exceptionally high standard and, in Petitioner's case, lacked merit. As such, Petitioner's attorney decision not to raise the defense prior to trial fell within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689. Further, after the presentation of the Government's evidence, Petitioner's attorney did move to dismiss the case because "the Government's conduct [was] outrageous," arguing that the Government had no suspicion that Petitioner was involved in any criminal activity at the inception of the reverse sting operation. [CR

Doc. 155 at 632]. The Court denied the motion. [CR Doc. 155 at 635-36]. The Court's rejection of Petitioner's motion establishes that the defense was not reasonably likely to proceed regardless of when it was raised. As such, Petitioner cannot show prejudice either.

Plaintiff's claim of ineffective assistance based on his attorney's failure to raise the defense of entrapment also fails. "[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." Mathews v. United States, 485 U.S. 58, 62-63 (1988). "The initial burden is on the defendant to go forward with evidence beyond a mere scintilla that the government induced him to commit a crime he was not otherwise predisposed to commit." Osborne, 935 F.2d at 37-38. If the defendant meets his initial burden, the United States has the burden of proving that the defendant was disposed to commit the criminal act prior to first being approached by government agents. United States v. Jones, 976 F.2d 176, 179 (4th Cir. 1992). "Predisposition … focuses upon whether the defendant was an 'unwary innocent' or instead, and 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." Mathews, 485 U.S. at 62-63.

A defendant's showing of "solicitation" will place the burden on the Government to go forward with evidence of predisposition. United States v. Velasquez, 802 F.2d 104, 105-06 (4th Cir. 1986). Inducement, in contrast to solicitation, "involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." United States v. Daniel, 3 F.3d 775, 778-79 (4th Cir. 1993). Petitioner cannot meet the initial burden of showing that the government induced him to commit a crime. Petitioner did not speak with government agents until he arrived at the gas station the day of the supposed robbery. There, he arrived gun in hand and said, "I'm ready." Suttles-Barden, not the government, engaged Petitioner to joint the conspiracy. Suttles-Barden, as a matter of law, was

11

not capable of entrapping Petitioner because he was not a government agent and he did not know that the people who recruited him were government agents. United States v. Squillocote, 221 F.3d 542, 574 (4th Cir. 2000) ("[A] defendant cannot claim an entrapment defense based on the purported inducement of a third party who is not a government agent if the third party is not aware that he is dealing with a government agent.").

Further, Petitioner need not have been persuaded, let alone induced, to join the robbery plan. Suttles-Barden merely had to ask Petitioner to participate and Petitioner readily accepted the opportunity. As such, because the evidence shows that Petitioner was not induced to commit a crime, his attorney was not constitutionally deficient for not advancing a meritless defense. Additionally, Petitioner's attorney could have reasonably concluded that a meritless defense was not worth the significant risk associated with advancing it. Namely, an entrapment defense would have risked opening the door to evidence about Petitioner's lengthy criminal history. See United States v. McLaurin, 764 F.3d 372, 381 (4th Cir. 2014) (explaining that bad-act evidence not admissible in other cases may be admissible in entrapment cases). Logically, evidence of those acts would have severely dampened the possibility of success on an entrapment defense because the evidence would have tended to show Petitioner's predisposition toward similar criminal activity.

Because Petitioner has not shown constitutionally deficient representation or prejudice as to these defenses, the Court will deny Petitioner's claim of ineffective assistance of counsel on this ground.

### C. Petitioner's Challenge of His § 924(c) Conviction

Under 28 U.S.C. § 2255, a petitioner is entitled to relief when his original sentence "was imposed in violation of the Constitution or laws of the United States, or [when] the court was

without jurisdiction to impose such sentence." 28 U.S.C. § 2255(a). Petitioner's contends that his conviction under § 924(c) is unconstitutional and must be vacated because, under Johnson v. United States, 135 S. Ct. 2551 (2015), Hobbs Act robbery is no longer a crime of violence. [CV Doc. 1]. As noted, Petitioner filed a supplement to his Section 2255 motion after the Supreme Court decided United States v. Davis. [CV Doc. 4].

In Johnson, the Supreme Court struck down the Armed Career Criminal Act's (ACCA) residual clause, 18 U.S.C. § 924(e)(2)(B)(ii), as unconstitutionally vague and held that enhancing a sentence under the ACCA's residual clause violates due process. Johnson, 135 S. Ct. at 2563. The ACCA residual clause defined a "violent felony" to include any crime punishable by a term of imprisonment exceeding one year that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). Accordingly, under Johnson, a defendant who was sentenced to a statutory mandatory minimum term of imprisonment based on a prior conviction that satisfies only the residual clause of the "violent felony" definition is entitled to relief from his sentence. The Supreme Court has held that Johnson applies retroactively to claims asserted on collateral review. Welch v. United States, 136 S. Ct. 1257, 1265 (2016).

Section 924(c), which is at issue here, criminalizes the use of a firearm in furtherance of a "crime of violence" or a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A). Under § 924(c), a crime is one of violence if it either "has an element the use, attempted use, or threatened use of physical force against the person or property of another," (the "force clause") or "by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "residual clause"). 18 U.S.C. § 924(c)(3)(B).

Nearly three years after the Petitioner filed his motion to vacate, the Supreme Court decided

United States v. Davis, 139 S. Ct. 2319 (2019). In Davis, the Supreme Court specifically held the residual clause of § 924(c)'s definition of "crime of violence" is "unconstitutionally vague." 139 S. Ct. at 2336. Since Davis, the Fourth Circuit has held that "Hobbs Act robbery constitutes a crime of violence under the force clause of Section 924(c)," United States v. Mathis, 932 F.3d 242, 266 (4th Cir. 2019), but that conspiracy to commit Hobbs Act robbery is not a crime of violence for § 924(c) purposes. United States v. Simms, 914 F.3d 229 (4th Cir. 2019). As such, Petitioner's conviction under § 924(c) would be invalid if it were based only on the Hobbs Act conspiracy predicate. Petitioner's § 924(c) conviction, however, was clearly based on both Hobbs Act conspiracy and drug trafficking conspiracy. There is no question that drug trafficking conspiracy remains a valid § 924(c) predicate. 18 U.S.C. § 924(c)(1)(A). As such, Petitioner's conviction thereunder is valid and Petitioner's motion to vacate will be denied on these grounds.

        **D.**      **Petitioner's Motion for Extension of Time**

On February 25, 2020, Petitioner filed a motion for extension of time to reply to the Government's response to his motion to vacate. [CV Doc. 13]. This motion will be denied. First, as Petitioner's motion to vacate was filed well before the December 2019 amendment to Rule 5(d) of the Rules Governing Section 2255 Proceedings, Petitioner has no absolute right to reply to the answer to his motion brought under 28 U.S.C. § 2255. See Peralta v. United States, No. 3:18-cv-486-RJC, 2019 WL 177948, at *2 (W.D.N.C. Jan. 11, 2019). Second, to the extent replies are allowed generally in a civil action, they must be filed within seven (7) days of the response. LCvR 7.1(e). Here, the Government filed its response on February 3, 2020. [CV Doc. 12]. As such, any reply, if allowed, would have been due before Plaintiff filed his motion for an enlargement of time, which is dated February 20, 2020 and was not filed until February 25, 2020. [CV Doc. at 2]. Third, Petitioner filed a 28-page brief in support of his motion to vacate, which is highly detailed

and thoroughly addresses each of Petitioner's arguments already. [See CV Doc. 1 at 13-41]. Fourth, the Court already allowed Petitioner to supplement his motion to vacate to provide additional argument on Petitioner's Johnson claim in light of Davis. Accordingly, given that Petitioner has no absolute right to reply, that Petitioner's motion for an enlargement of time was made out of time, that Petitioner has had ample opportunity to present his arguments to the Court, and that additional argument would not change the outcome of these proceedings, the Court will deny Petitioner's motion for more time.

## IV. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 petition and denies Petitioner's motion for an enlargement of time.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED** and **DISMISSED**.

2. Petitioner's Motion for an Enlargement of Time [Doc. 13] is **DENIED**.

3. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

**IT IS SO ORDERED.**

Signed: March 3, 2020

Frank D. Whitney
Chief United States District Judge